## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

William R. Booth, Jr.,     :  Case No. 08 CV 00332

  Plaintiff,       :

    vs.        :

Commissioner of Social Security,   :  **MAGISTRATE'S REPORT AND**
                **RECOMMENDATION**

  Defendant.       :

   Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423. Pending are the parties' briefs and Plaintiff's Reply (Docket Nos. 20, 23 and 24). For the reasons set forth below, the undersigned recommends that the Commissioner's decision be affirmed and the referral to the Magistrate be terminated.

## PROCEDURAL BACKGROUND

   Plaintiff applied for DIB on July 30, 2001, alleging that he had been disabled since March 22, 2001 (Tr. 51-53). His application was denied initially and on reconsideration (Tr. 37-40, 33-35). On June 9, 2005, Plaintiff, represented by counsel, appeared at a hearing conducted by Administrative Law Judge (ALJ) Richard Verwiebe (Tr. 571). On February 23, 2006, ALJ Verwiebe issued an unfavorable decision (Tr. 17-26). The Appeals Council denied Plaintiff's request for review on December 20, 2007 (Tr. 6-8). Plaintiff filed a timely request for judicial review in the United States District Court for the

Northern District of Ohio, Western Division.

## JURISDICTION

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## FACTUAL BACKGROUND

At the time of hearing, Plaintiff was 42 years of age, 5'9" tall and weighed 250 pounds (Tr. 573, 574). Plaintiff completed the eleventh grade, was divorced and the father of two minor children (Tr. 575). He resided with his sister and her children (Tr. 583-584).

Plaintiff was last employed twenty years prior to the administrative hearing as a supervisor in a propane plant. He was employed in this capacity for two years (Tr. 576). Prior to that, Plaintiff managed a restaurant for six months (Tr. 577). In that capacity, he cooked and ordered the food (Tr. 578, 579). Earlier, Plaintiff had been employed at Ponderosa Steak House (Tr. 579). At sometime during his career, Plaintiff was employed as a janitor. He left this job because of increased demands by his employer (Tr. 581). Plaintiff also held seasonal jobs at the Toledo Sports Arena (Tr. 582). He became short of breath when cleaning offices and sweeping floors (Tr. 581-582). In the 1990s Plaintiff was employed as a pizza delivery person. He could not perform similar work currently because of the constant driving, the "getting in and out of the car" and the high level of frustration (Tr. 591).

During the course of his employment at the propane plant, Plaintiff had his first heart attack. He did not return to work because he could not withstand the stress. Subsequently, he had a second heart attack (Tr. 580). He claimed that he could clean the ALJ's office every night for an hourly wage of $10. He stated, however, that he would be unable to sustain employment if the demand for productivity

increased (Tr. 581).

Plaintiff was hypertensive and suffered from dyspnea (Tr. 590).  He had a hernia in his stomach and another at his rib cage (Tr. 592).  Plaintiff testified that he had five heart attacks (Tr. 589).  He underwent coronary bypass surgery and had three stents implanted (Tr. 589).  During the past four years, Plaintiff had undergone treatment with a psychiatrist for post-coronary attack episodic rage and anger (Tr. 586-587, 588).  Plaintiff considered the psychiatric treatment to be helpful provided he took his medicine consistently (Tr. 588).  Plaintiff took a sleep aid; however, the side effects included dizziness (Tr. 587).

Plaintiff read with difficulty (Tr. 575, 576).  Consequently, he was confused about following directions when cooking.  He was able to feed, bathe and dress himself (Tr. 587).  Walking exacerbated Plaintiff's dyspnea and sometimes caused dizziness (Tr. 591).  He could lift about twenty pounds (Tr. 592).

## **MEDICAL EVIDENCE**

**1.      Dr. Ravi K. Adusumilli, M. D., Cardiologist (Tr. 294-296; 297-299; 368-369; 393-395; 398-399; 408-409; 432-448; 558-560).**

Dr. Adusumilli determined that Plaintiff's blood pressure was well controlled on medication as of June 27, 2003 (Tr. 368).  Dr. Adusumilli ordered lipid and liver profiles to be conducted on July 1, 2003.  The results showed a high level of cholesterol; however, his electrolytes, liver and triglyceride profiles were within normal limits (Tr. 398-399).

On January 9, 2004, Plaintiff's cholesterol, HDL level was slightly elevated and, his triglyceride level was borderline high (Tr. 395-396).  On January 19, 2004, Dr. Adusumilli, confirmed the existence of a septal defect; without evidence of significant large ischemia.  Plaintiff's left ventricular systolic function was normal (Tr. 365).  The status post cardiac catheterization performed on January 27, 2004,

3

corroborated the existence of coronary heart disease and high amounts of lipids in the bloodstream (Tr. 295-296). On February 16, 2004, Dr. Adusumilli monitored Plaintiff's consumption of medication and reinforced his advice to lose weight and exercise (Tr. 409).

In September 2004, Dr. Adusumilli found that Plaintiff's coronary artery disease was stable with no active angina pectoris, and the elevation of lipids in the bloodstream was controlled with medication. Later in November, Dr. Adusumilli was the attending physician when Plaintiff presented to St. Vincent Mercy Medical Center with chest tightness (Tr. 309). Myocardial infarction was ruled out immediately (Tr. 313, 358). The results from the stress electrocardiogram were generally negative. The sinus rhythm was normal with no irregular heart beat and or chest pain (Tr. 355). The cardiac catheterization showed evidence of a coronary lesion representing a greater than 50% reduction in the coronary diameter of Plaintiff's major coronary artery and severe proximal to mid right coronary artery disease up to 90% stenosis (Tr. 326, 358). Plaintiff was diagnosed with unstable angina (Tr. 333). Medications were prescribed to prevent platelet clumping, to control blood pressure and lower his cholesterol (Tr. 358).

In December 2004, Dr. Adusumilli introduced mood stabilizing medication into Plaintiff's drug regimen (Tr. 438-440). The results of the stress electrocardiogram examination showed normal sinus rhythm and no large areas of stress-induced myocardial ischemia were detected (Tr. 443, 444). The cholesterol, triglycerides and liver profiles, all conducted on December 13, 2004, showed that Plaintiff was not at risk (Tr. 393-394).

In March 2005, Dr. Adusumilli increased the dosage of medication prescribed to improve Plaintiff's cholesterol levels (Tr. 434). When assessed in June 2005, Plaintiff's cholesterol levels were within the normal range (Tr. 474). Later on October 21, 2005, Dr. Adusumilli noted that Plaintiff had left anterior descending artery disease and stable angina pectoris (Tr. 559). In December 2005, Dr.

4

Adusumilli informed the ALJ of Plaintiff's overall worsening of his left ventricle ejection fraction. His prognosis was that Plaintiff's condition might worsen (Tr. 558).

2.   **Michele Bender, Psychiatrist Advanced Practice Nurse (Tr. 509-546).**

Based upon diagnoses of bipolar disorder II, organic brain syndrome and post traumatic stress disease, Nurse Bender conducted several pharmacological reviews during which she monitored the consumption of medication prescribed to control Plaintiff's mood (Tr. 111, 509, 510, 511, 514, 520, 524, 530, 539, 541). Overall, Plaintiff was doing fairly well with mood control, he was sleeping well and he had included some behavioral changes such as dieting and exercising daily (Tr. 510). Nurse Bender opined that Plaintiff's ability to function daily or weekly was affected by fatigue, road rage, chronic depression and the need for oxygen.

3.   **Dr. Dean M. Bernardo, M.D. (Tr. 230-231; 261-268; 283-285; 286-290; 291-293; 450-455)**.

Dr. Bernardo discovered that Plaintiff had an enlarged heart on December 6, 2002 (Tr. 268). On December 10, 2002, Dr. Bernardo attributed Plaintiff's "large smoking history" to the onset of chronic obstructive pulmonary disease (COPD) as well as sleep apnea (Tr. 267).

Plaintiff was supplied with a continuous positive airway pressure (CPAP) mask to treat sleep apnea on January 24, 2003 (Tr. 230). In February, Dr. Bernardo ordered an electrocardiogram which showed thickened leaflet of the mitral valve and mild mitral insufficiency, normal aortic and tricuspid valves, a dilated left atrium and normal size right atrium, right ventricle and aortic root (Tr. 232, 233). On May 19, 2003, Dr. Bernardo noted that Plaintiff's sleep apnea syndrome was resolved with the addition of the nasal CPAP machine (Tr. 284). Plaintiff's apnea symptoms appeared to be under better control on June 27, 2003 (Tr. 292).

Dr. Bernardo was concerned on January 17, 2005 that the pressure from the CPAP machine was

making it difficult for Plaintiff to exhale (Tr. 451, 452).  On January 24, 2005, Plaintiff underwent a sleep study which showed that Plaintiff should be switched to a bi-level positive airway pressure apparatus (BiPAP) (Tr. 456, 466, 468-471).  As of May 6, 2005, Plaintiff's apnea/hypopnea index was normal and he had no difficulty sleeping (Tr. 456).

**4.      Dr. James F. Bingle, M. D. (Tr. 234-235).**

Plaintiff presented with significant symptomatology so a cardiac catheterization was performed on September 25, 2002 (Tr. 234).  The results showed significant single vessel coronary artery disease with severe disease in the left anterior descending artery (Tr. 235).

**5.      Richard N. Davis, Clinical Psychologist (Tr. 168-175).**

Psychological testing was administered on May 13, 2002, during which Plaintiff scored a verbal intelligence quotient (IQ) score of 65, a performance IQ of 68 and a full scale IQ of 63 (Tr. 172). Plaintiff's memory quotient score was 61 and he was able to pronounce words at the 5th grade level (Tr. 173).  Mr. Davis classified Plaintiff with a depressive disorder, borderline functioning capabilities, "a long list of physical problems," psychosocial stressors and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 174).  Mr. Davis also noted that Plaintiff had anger management issues and he had not dealt effectively with the stresses and pressures of life (Tr. 175).

**6.      Dr. Durrani (Tr. 483-485)**

Dr. Durrani prescribed an antibiotic for right middle ear infection that recurred on or about January 17, 2001 (Tr. 485).  Sometime thereafter, Plaintiff presented with an earache and hearing loss. He was prescribed an antibiotic (Tr. 484).  Although the right middle ear infection was resolved, Plaintiff continued to have difficulty hearing on February 14, 2001 (Tr. 483).

**7.      Dr. Richard A. Katzman (Tr. 269-275).**

Dr. Katzman conducted a limited cardiac examination on October 2, 2002 and determined that Plaintiff had severe coronary artery disease (Tr. 275).  In April 2003, Plaintiff was referred to Dr. Katzman for "re-evaluation" (Tr. 269-270).  The heart was not enlarged and no murmurs were present. A baseline resting electrocardiogram showed normal sinus rhythm (Tr. 269).

**8.      Mental Residual Functional Capacity Assessment (Tr. 240-242).**

Dr. Michael D. Wagner, Ph.D., determined on July 25, 2002, that Plaintiff was moderately limited in his ability to:  (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods of time, (4) perform activities within a schedule, (5) work in coordination with or in proximity to others, (6) complete a normal work week, (7) interact appropriately with the general public, (8) accept instructions and respond appropriately (9) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (10) respond appropriately to changes in the work setting (11) be aware of normal hazards and appropriate precautions and (12) set realistic goals or make plans independently of others (Tr. 240-241). Based on his past work and overall presentation, Dr. Wagner concluded that Plaintiff had a borderline IQ, he could follow simple instructions, he had a slow pace and he would have difficulty with adaptation due to decreased IQ (Tr. 242).

**9.      Mercy Health Partners (Tr. 402).**

Plaintiff was treated for unspecified chest pain on February 23, 2005.  Plaintiff was observed and routinely discharged (Tr. 402).

**10.     MetroHealth Medical Center (Tr. 102-167).**

Dr. Mehdi Pajouh examined Plaintiff on March 28, 2002, for follow-up care after stent placement.  Plaintiff had high blood cholesterol and he continued to have mild angina and chronic

inflammatory response to the placement of the stent in the walls of the arteries (Tr. 103).

Plaintiff was treated for a syncopal episode on August 14, 2001 (Tr. 156). Plaintiff underwent a cardiac catheterization on August 15, 2001, which confirmed the presence of three-vessel coronary artery disease (Tr. 153). The magnetic resonance angiography of Plaintiff's neck showed normal results (Tr. 137). The magnetic resonance imaging of Plaintiff's brain administered on August 21, 2001, showed normal results of the brain and brain center (Tr. 136).

The catheterization administered on November 13, 2001 showed three vessel coronary artery disease (Tr. 148-149). Dr. David Schnell tested Plaintiff's left and right ventricular systolic function on November 13, 2001, finding that his right ventricular systolic function was normal but there was abnormally slow movement of the septal apex in the right ventricular system (Tr. 120). The average volume of Plaintiff's platelets exceeded reference range (Tr. 145). Evidence of coronary calcification was noted after the fluoroscopy was administered on November 13, 2001 (Tr. 128). In December, Dr. Pajouh treated Plaintiff's symptoms of acute bronchitis with inhalers (Tr. 115).

There was no improvement in Plaintiff's lung capacity as a result of bronchodilator therapy administered on January 28, 2002. In fact the total lung capacity was reduced consistent with mild restrictive ventilatory defect (Tr. 112).

**12.    Physical Residual Functional Capacity Assessment (Tr. 221-229).**

Dr. Eli N. Perencevich, Doctor of Osteopathic Medicine (DO) opined that Plaintiff was an obese male (Tr. 222). Plaintiff's description of the severity of his symptoms was partially credible (Tr. 226). Based on his reasoned judgment, Plaintiff could occasionally lift twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and push and/or pull without limitations (Tr. 222). Plaintiff could only occasionally

climb using a ramp, ladder, rope, scaffold or stairs but he could frequently balance, stoop, kneel, crouch and crawl (Tr. 223). There were no manipulative or visual limitations (Tr. 224-225). Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, fumes and odors (Tr. 225).

**13.    Psychiatric Review Technique (Tr. 245-257)**.

Dr. Wagner diagnosed Plaintiff with a depressive disorder and borderline intellectual functioning (Tr. 248, 249). He found that Plaintiff's functional limitations such as restrictions of daily living, maintaining social functioning and maintaining concentration, persistence or pace were moderately limited (Tr. 255).

**14.    St. Vincent Mercy Medical Center (Tr. 400-431).**

Plaintiff presented for treatment of chest pain. The results of the cardiac catheterization showed distal coronary artery stenosis. The coronary artery was successfully stented (Tr. 403). Compared to the  two views of Plaintiff's chest taken on November 4, 2004, the views taken on February 21, 2005, showed a stable enlarged heart (Tr. 431). On February 22, 2005, Dr. Tamirisa Praveen diagnosed Plaintiff with unstable angina (Tr. 462).

**15.    Dr. Robert Taylor Seagraves, Psychiatrist (Tr. 237-239).**

In assessing Plaintiff's cognitive functioning, on February 7, 2003, Dr. Seagraves found that Plaintiff had mild memory impairment, normal insight and judgment. Although his major depressive disorder was severe, it was stabilized on medication (Tr. 238).

**16.    Toledo Hospital (Tr. 187-220).**

Plaintiff was admitted to the hospital with non-specific chest pain on September 23, 2002 (Tr. 202-204). The electrocardiogram administered upon admission showed evidence of abnormality (Tr. 211-215). Radiologist Daniel Singer, M.D., found evidence of stress induced ischemia in the anterior

wall of the left ventricle on September 24, 2002 (Tr. 195).  On September 24, 2002, the results of

Plaintiff's stress electrocardiogram analysis were inconclusive in searching for the restriction of blood

supply to the heart (Tr. 194)

**17.    Dr. Kim Togliatti-Trickett (Tr. 176-186).**

On August 21, 2002, Dr. Togliatti-Trickett conducted a clinical interview and physical

examination, after which she diagnosed Plaintiff with coronary artery disease, COPD, asthma,

bronchitis, depression and hypertension (Tr. 178).  The results of the electrocardiogram administered

on the same date were abnormal (Tr. 179-180).

Dr. Togliatti-Trickett opined that Plaintiff could raise her shoulders, elbows, wrists, fingers, hips,

knees, feet and great toe extensors against maximal resistance.  His grasp, manipulation, pinch and fine

coordination were all deemed within the normal range (Tr. 182).  The range of motion in Plaintiff's

dorsolumbar and cervical spine, shoulders, elbows, hips, knees, ankles, wrists and hands/fingers was

within normal limits (Tr. 183-184).

X-rays of Plaintiff's chest administered on August 21, 2002, showed borderline enlargement of

the heart (Tr. 185).

**18.    Dr. Michael Walkovich, Doctor of Podiatric Medicine (Tr. 375-378; 449).**

Plaintiff's ingrown nail was removed on June 28, 2004 (Tr. 376).  The drainage continued and

Plaintiff was advised to continue soaking his foot and apply drops (Tr. 378).

**19.    Dr. Alan White, Ph. D., Licensed Psychologist (Tr. 341-350).**

Dr. White administered the Wechsler Adult Intelligence Scale III on November 23, 2004;

however, he deemed the results invalid due to Plaintiff's lack of perseverance throughout the testing

process.  Plaintiff's invalid scores included a full scale IQ of 59, a performance IQ of 60 and a verbal

10

IQ of 64 (Tr. 345).  According to the Nelson Reading Test, Plaintiff's ability to read was on the fifth

grade level.  Some moderate symptoms or moderate difficulties in social, occupational, or school

functioning were prevalent at the time of the interview (Tr. 346).

Dr. White opined that Plaintiff's ability to understand and remember detailed instructions, carry

out those instructions, interact appropriately with the public, interact appropriately with supervisors and

interact appropriately with co-workers was slightly affected by his impairment (Tr. 348-349).  Plaintiff's

ability to respond appropriately to work pressures in a usual work setting and respond appropriately to

changes in the routine work setting was moderately affected by his impairment (Tr. 349).

**20.    Dr. Mark Young (Tr. 230-231; 379-391; 454-506; 555-556).**

Dr. Young assumed the role of Plaintiff's primary care physician commencing October 25, 1999,

when Plaintiff presented with an ingrown toenail.  Plaintiff was already on a regimen that included

medication to treat high cholesterol, high blood pressure, infection, asthma symptoms and coronary

artery disease (Tr. 491).  In December 1999, Dr. Young prescribed an antidepressant to address

symptoms of anxiety and depression (Tr. 490).

On January 21, 2000, Plaintiff was treated for pharyngitis (Tr. 489).  Later in February 2000,

Plaintiff reported to Dr. Young that his mood and depression had improved (Tr. 488).

In August 2002, a random test revealed evidence of elevated blood sugar.  Plaintiff was urged

to quit smoking and follow a low sodium, low cholesterol diet.  There was evidence of elevated blood

sugar (Tr. 482).  Dr. Young reviewed Plaintiff's medication lists on November 21, 2002, and continued

all medications prescribed for the treatment of heart disease, asthma and mental health (Tr. 481).

On July 18, 2003, Dr. Young discovered that Plaintiff had a slight narrowing of the disc space

between L5 and S1 so he ordered a nerve conduction study and electromyography (Tr. 371, 373).  On

11

July 28, 2003, the electromyography consultant, Dr. Samuel M. Park, summarized the results, finding that Plaintiff's manual muscle strength was normal, his reflexes were brisk and symmetric and the sensation in his left leg and foot were decreased.  There was no evidence of radiculopathy, plexopathy or peripheral neuropathy such as seen with diabetes (Tr. 374).  In August 2003, Dr. Young certified that Plaintiff was medication dependent for treatment of hypertension, hyperlipidemia, gastrointestinal reflux disease, asthma, sleep apnea, low back pain, status post myocardial infarction, status post stent placement, coronary artery disease, status post coronary bypass grafting and bipolar disorder (Tr. 480).

On January 27, 2004, a lesion was observed in the circumflex artery during catheterization. Since it was borderline, medical therapy was recommended (Tr. 364).  Dr. Young certified that as of March 9, 2004, Plaintiff was medication dependent for treatment of hypertension, hyperlipidemia, gastrointestinal reflux disease, asthma, sleep apnea, low back pain, coronary artery disease, bipolar disorder, status post myocardial infarction and status post coronary artery bypass graft surgery (Tr. 479).

From February 20, 2003, through November 4, 2004, and on January 27, March 15, June 13, 2005, Dr. Young monitored Plaintiff's consumption of up to twenty medications prescribed by Drs. Adusumilli, Bender, Bernardo and Young to treat, *inter alia*, acid reflux, asthma, bronchitis, bipolar disorder coronary artery disease, depression, edema, hypertension, hyperlipidemia, low back pain, sleep apnea and status post stent placement (Tr. 380-391, 454, 455, 476).  In the interim, Dr. Young again certified that as of August 25, 2004, Plaintiff was medication dependent for treatment of hypertension, hyperlipidemia, gastrointestinal reflux disease, asthma, sleep apnea, status post myocardial infarction and status post coronary artery bypass grafting (Tr. 480).

Dr. Tamirisa confirmed that Plaintiff had unstable angina on February 22, 2005 (Tr. 410, 414). On March 8, 2005, Dr. Young again certified that Plaintiff was medication dependent for treatment of

hypertension, hyperlipidemia, coronary artery disease, gastrointestinal reflux disease, asthma, sleep apnea, status post myocardial infarction and status post coronary bypass grafting (Tr. 477).  Plaintiff presented on June 13, 2005, with a chief complaint of hypertension, allergic rhinitis and gastrointestinal reflux disease (Tr. 476).  On June 21, 2005, Dr. Young treated Plaintiff for a right middle ear infection (Tr. 475).

On September 29, 2005, Dr. Young, referred Plaintiff for a cardiologist consultation to address uncontrolled angina (Tr. 555-556).

## STANDARD FOR DISABILITY

To qualify for DIB, a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Act.  42 U. S. C. § 423 (Thomson Reuters/West 2008).  "Disability" as defined in the Act, denotes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context)).

To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that result in death or can be expected to last for a period of twelve months and the impairment renders the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. § 423(d)(2) (Thomson Reuters/West 2008).  Regardless of the actual or alleged onset of disability, the claimant is entitled to benefits beginning with the first month covered by the application in which the claimant meets all of the other requirements for entitlement.  20 C. F. R. § 404.316 (Thomson

13

Reuters/West 2008).

To determine disability, the Commissioner has established a sequential evaluation process for disability determinations.  20 C.F.R. § 404.1520 (a)(4) (Thomson Reuters/West 2008).  First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled.  20 C.F.R. § 404.1520 (a)(4) (i) (Thomson Reuters/West 2008).

Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled.  20 C.F.R. § 404.1520 (a)(4) (ii) (Thomson Reuters/West 2008).

Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990)].  20 C.F.R. § 404.1520 (a)(4) (iii) (Thomson Reuters/West 2008).  If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded.  20 C.F.R. § 404.1520 (a)(4) (iii) (Thomson Reuters/West 2008).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled.  20 C.F.R. § 404.1520 (a)(4) (iv) (Thomson Reuters/West 2008).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. 20 C.F.R. § 404.1520 (a)(4) (v) (Thomson Reuters/West 2008).

During the first four steps, the claimant has the burden of proof.  *Walters v. Commissioner of Social Security*, 127 F. 3d 525, 529 (6th Cir. 1997) (*citing Young v. Secretary of Health and Human*

14

*Services*, 925 F.2d 146, 148 (6th Cir. 1990); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987)).  This burden shifts to the Commissioner only at Step Five.  *Id*.

## ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements of the Act through December 31, 2006.

2.  Plaintiff had not engaged in substantial gainful activity at any time relevant to this decision.

3.  Plaintiff had severe impairments of coronary artery disease, obesity and depression.

4.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P.

5.  Plaintiff retained the residual functional capacity to exert up to ten pounds of force occasionally, and/or a negligible amount of force frequently to lift, carry, push or otherwise move objects, including the human body.  Plaintiff could sit most of the day with brief periods of walking/standing and he was restricted to performing simple tasks.

6.  Plaintiff was unable to perform his past relevant work.

7.  Plaintiff, a "younger individual," with a limited education and ability to communicate in English and the aforementioned residual functional capacity, could perform work that existed in the national economy.

8.  Transferability of job skills was not material to the determination of disability because of Plaintiff's age.

9.  Plaintiff was not under a "disability," as defined in the Act, at any time from March 2, 2001 through February 23, 2006.

(Tr. 19-25).

## STANDARD OF REVIEW

Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel.*

15

*Golay v. Commissioner of Social Security,* 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.  'Substantial evidence' means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept. ' "  *Foster v. Halter,* 279 F.3d 348, 353 (6th Cir. 2001) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Furthermore, the court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Id.* (*citing Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## DISCUSSION

Plaintiff seeks reversal of the Commissioner's decision on the following bases:  First, the ALJ erred in failing to find many other severe impairments such as lumbar disc disease, sleep apnea, pulmonary impairments and a limited intellectual capacity.  Second, Plaintiff's coronary artery disease with significant blockage and an ejection fraction of 35% met the Cardiac Listings found at 20 C. F. R. § 404, Appendix 1, Subpart P at § 4.00.  Third, the ALJ erred in failing to find that his mental impairment met the Mental Impairment Listing found at 20 C. F. R. § 404, Appendix 1 to Subpart P at 12.04.  Fourth the ALJ failed to address Plaintiff's limited intellectual ability.  Fifth, the ALJ failed to assess the combined effect of Plaintiff's impairments or determine medical equivalence.  Sixth, the fourth prong of the sequential evaluation remains in dispute.  Seventh, the ALJ misinterpreted Dr. Adusumilli's opinions.  Eighth, this Court should reevaluate Dr. Adusumilli's opinions.

## 1.     The ALJ Erred in Failing to Find Other Severe Impairments.

16

Plaintiff concurs in the ALJ's determination that he had severe impairments such as coronary artery disease, obesity and depression.  He does not concur, however, that this list of impairments is exhaustive.  Plaintiff argues that the ALJ failed to find that he had other severe impairments such as lumbar disc disease, sleep apnea, pulmonary impairments and a limited intellectual capacity.

The regulations do not define a severe impairment.  Instead the regulations state that a non-severe impairment is as an impairment or combination of impairments that do not significantly limit the claimant's physical or mental ability to do basic work activities.  20 C. F. R. § 404.1521(a) (Thomson Reuters/West 2008).  Therefore, a medically determinable impairment that causes some limitations of the claimant's ability to perform basic work related activities complies with the meaning of the regulations.

In this case, there is a lack of substantial evidence that Plaintiff's lumbar disc disease, sleep apnea, pulmonary impairments or limited intellectual capacity rise to the level of severity contemplated under the regulations.

### A.    Lumbar Disc Disease.

Review of the transcript revealed that on June 27, 1994, Dr. Jaweed treated Plaintiff for low back pain (Tr. 505).  Plaintiff complained of a back ache on October 16, 1995 (Tr. 503).  The radiological report administered on July 18, 2003, as a result of Plaintiff's complaints of back pain showed a slight narrowing of the disc space between L5 and S1 (Tr. 371).  The nerve conduction study conducted ten days later, ruled out radiculopathy, plexopathy or peripheral neuropathy (Tr. 374).  Dr. Young included low back pain in his certification of medical dependency on August 29, 2003 but omitted such reference when he certified Plaintiff's medical condition on March 9 and August 25, 2004 (Tr. 478, 479, 480).

Plaintiff's complaints of back pain do not meet the definition in the regulations as an impairment

17

that significantly limit the claimant's physical or mental ability to do basic work activities.  The ALJ did not err in failing to find that Plaintiff's back aches constituted a severe impairment.

### B.  Sleep Apnea

Plaintiff contends that the ALJ erred in failing to determine that he was severely impaired by sleep apnea.

The longitudinal study of Plaintiff's sleep impairment began with a documented bout of insomnia commencing on December 9, 1996 (Tr. 499).  Plaintiff underwent a series of sleep studies and was diagnosed with sleep apnea (Tr. 230, 265-267, 283-285, 287, 290, 292-293, 383, 384, 385, 386, 388, 389, 391, 402, 450-453, 454, 455, 456, 459, 466-471).  His apnea index was normalized when he was prescribed the BiPAP machine (Tr. 466).

This record shows that Plaintiff's sleep apnea was resolved with the use of the BiPAP machine.  The record does not show that Plaintiff's sleep apnea rises to the level of impairment that significantly limits his physical or mental ability to do basic work activities.  The ALJ did not err in failing to find that Plaintiff's sleep apnea constituted a severe impairment.

### C.  Pulmonary Impairments

Plaintiff contends that the ALJ erred in failing to find that his pulmonary impairments were severe.  The Magistrate finds that the medical evidence does not support a finding that Plaintiff was disabled by pulmonary pollutants.

Plaintiff's asthma was stable so long as he took the prescribed medication (Tr. 165, 380, 383, 384, 385, 386, 388, 389, 391, 419, 454, 481).  Chronic bouts of bronchitis were treated with antibiotics (Tr. 178, 455, 475, 493, 497, 506).  In a medical analysis conducted on April 2, 2003, an examining physician noted the existence of COPD (Tr. 243).  Plaintiff's airway resistance improved with the

introduction of a bronchodilator (Tr. 112).  The progression of COPD was noted once on June 27, 2003 (Tr. 366, 368).

Assuming that these pulmonary signs were shown by medically acceptable clinical or diagnostic techniques, there is no evidence that any of them significantly limit Plaintiff's physical ability to work. Since the pulmonary impairment do not meet the level of severity defined in the regulations, the Magistrate cannot find that the ALJ erred in failing to find that Plaintiff was impaired by pulmonary disease.

**D.**      **Borderline Intellect**

Plaintiff argues that the ALJ erred in failing to find that his limited intellectual capacity was a severe impairment.

There is no evidence that Plaintiff's limited intellect was severe.  The tests administered by Dr. White were deemed invalid (Tr. 345).  The evidence showed that Plaintiff was within the mild mental retardation range; however, the examiner opined that Plaintiff's overall performance throughout his life suggested that Plaintiff was capable of at least lower borderline functioning or somewhat higher functioning (Tr. 173).

Clearly, there is nothing in the record to suggest that Plaintiff's intellect was of the severity that it impaired his ability to do basic work activities.  The ALJ did not err in failing to find that Plaintiff's borderline intellect constituted a severe impairment.

**2.**      **The ALJ Failed to Find That Plaintiff's Coronary Impairment Met the Listing.**

Plaintiff claims that his coronary artery disease with significant blockage and an ejection fraction of 35% meets the Cardiac Listings found at 20 C. F. R. § 404, Appendix 1, Subpart P at §§ 4.04B and 4.04C.  In the alternative, Plaintiff contends that the exercise testing used to determine whether an

19

impairment meets or is equivalent in severity of Section 4.04A, was incomplete.  The ALJ should have consulted with a medical advisor or Plaintiff's physician to accurately evaluate the severity of Plaintiff's coronary impairment.

### A.      Failure to Make the Record

Plaintiff argues that the ALJ's decision is not based on substantial evidence because he failed to make an appropriate record.  The ALJ was required to contact Dr. Adusumilli for an explanation of Plaintiff's inability to undergo further exercise testing or analyze alternate listing sections.  The ALJ also erred in failing to contact a medical advisor to testify at the hearing.

The Social Security regulations address the need to recontact treating physicians under 20 C. F. R. § 404.1512(e).  When the evidence received from a treating physician or psychologist or other medical source is inadequate for a determination of whether the claimant is disabled, he or she will be recontacted to obtain the information.  20 C. F. R. § 404.1512(e) (Thomson Reuters/West 2008).  The treating physician or psychologist will be recontacted when the report does not contain all of the necessary information or a conflict or ambiguity must be resolved.  20 C. F. R. § 404.1512 (e)(1) (Thomson Reuters/West 2008).

It was unnecessary  to recontact Dr. Adusumilli as he ordered in December 2004,  a cardiac stress test during which Plaintiff's heart and vascular system were evaluated during exercise.  The results of this test showed normal sinus rhythm (Tr. 443).  Dr. Adusumilli has already analyzed Plaintiff's ability to engage in exercise testing.

With respect to Plaintiff's claim that the ALJ erred by failing to contact a medical advisor, the Magistrate does not hold that the ALJ was required to accept testimony from a medical advisor.  The language of the regulations suggests that the ALJ's use of medical advisors is permissive, not

mandatory. 20 C. F. R. § 404.1527(f)(2) (Thomson Reuters/West 2008).  The ALJ may ask for and consider the opinions of medical advisors on the nature and severity of an impairment and whether it equals the requirements of any of the listed impairments.  20 C. F. R. § 404.1527(f)(2) (Thomson Reuters/West 2008).  The matters in this case were not necessarily complex and there was no substantial conflicting evidence.  Thus, the ALJ's failure to call a medical advisor does not prevent the Magistrate from finding that substantial evidence supported his decision.

### B.  Section 4.04A of the Listing

Under Section 4.04A of the Listing, 20 C. F. R. Pt. 404, Subpt. P, App.1, the claimant must have ischemic heart disease (resulting when one or more of your coronary arteries is narrowed or obstructed or, in rare situations, constricted due to vasospasm) interfering with the normal flow of blood to your heart muscle (ischemia)) with symptoms due to myocardial ischemia, as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment (see 4.00B3 if there is no regimen of prescribed treatment).

The results of perfusion imaging and stress tests administered on January 19, January 23 and December 14, 2004, showed no significant ischemia (Tr. 356, 358, 363, 365, 444).  Plaintiff was given a "visiting diagnosis" of chronic ischemic heart disease when he presented to MetroHealth on July 26, 2001 (Tr. 159).  There were no definitive clinical or diagnostic techniques administered to corroborate the diagnosis or to demonstrate that Plaintiff was on a regimen of prescribed treatment for ischemic heart disease.  It is clear from the medical record that Plaintiff did not present sufficient evidence to meet the threshold requirement showing ischemic heart disease or treatment for ischemic heart disease.  The ALJ did not err in failing to evaluate Plaintiff's heart disease under Section 4.04A of the Listing.

### C.  Section 4.04B of the Listing

Under Section 4.04B of the Listing, there must be evidence of three separate ischemic episodes,

each requiring revascularization or not amenable to revascularization (see 4.00E9f), within a consecutive 12 month period (see 4.00A3e).

Even if the four notations of ischemic heart disease were deemed episodic, there is no evidence that revascularization was required following each episode.  Consequently, Plaintiff's allegation of an impairment meeting the requirements of Section 4.04B of the Listing lacks merit.

**D.**     **Section 4.04C of the Listing**

A claimant with coronary artery disease meets the Listing by concluding from angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, the opinion of a medical consultant,  preferably one experienced in the care of patients with cardiovascular disease, that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

1.     Angiographic evidence showing:

a.     50 percent or more narrowing of a nonbypassed left main coronary artery; or
b.     70 percent or more narrowing of another nonbypassed coronary artery; or
c.     50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
d.     50 percent or more narrowing of at least two nonbypassed coronary arteries; or
e.     70 percent or more narrowing of a bypass graft vessel; and

2.     Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

There is substantial evidence in the record that Plaintiff has coronary artery disease.  However, there are three factors that indicate Plaintiff's disease does not meet the provisions of Section 4.04C of the listing.  First, there is no indication from Dr. Adusumilli that performance of exercise tolerance testing would present a significant risk.  Second, there is evidence that Plaintiff underwent bypass

22

surgery.  Except for subsection "e" the angiographic evidence must result from nonbypassed arteries (Tr. 493).  Third, under subsection "e", the angiographic evidence must show that there is 70% or more stenosis of a bypass graft vessel.  Plaintiff had 90% stenosis in his right coronary artery prior to placement of a drug eluting stent.  There was 0% stenosis after surgery (Tr. 448).  Plaintiff had 70 to 80% stenosis in the first obtuse marginal vessel prior to placement of a drug eluting stent.  After the stent was implanted, Plaintiff had 0% stenosis.  In his distal right coronary artery, Plaintiff had 65-70% stenosis prior to undergoing an angioplasty on February 22, 2005.  There was 0% stenosis post angioplasty (Tr. 412).

The angioplasty evidence does not support a finding that Plaintiff's coronary artery disease meets Section 4.04C of the Listing.  Therefore, the Magistrate will not disturb the ALJ's decision that Plaintiff's coronary artery disease was severe but it did not meet or medically equal one of the listed impairments in Appendix 1.

### 3.        The ALJ Failed to Find That Plaintiff's Mental Impairment Met the Listing.

The ALJ found that Plaintiff has a severe mental impairment.  The ALJ did not find that the severe mental impairment met Listing 12.04 (Tr. 20).  Plaintiff concurs in the ALJ's finding that he has a mentally determinable impairment aptly categorized as depression and that his depression is severe.  Plaintiff disputes the ALJ's finding that his mental impairment fails to satisfy Section 12.04C of the Listing.  Plaintiff highlights evidence in the record which demonstrates that he made only a marginal adjustment.  To the extent that the ALJ found otherwise, Plaintiff argues that a medical advisor should have been employed to complete the record.

### A.        Does Plaintiff's Mental Impairment Meet Section 12.04C of the Listing?

Plaintiff contends that the uncontroverted evidence shows that he has an affective disorder, he

suffered from a disorder for at least two years and that his condition has resulted in more than a minimal limitation in his ability to do basic work activity despite treatment. Plaintiff maintains that his condition has resulted in such marginal adjustment that a minimal increase in mental demands or change in his environment would likely cause him to "decompensate."

The required level of severity for a determination that chronic affective disorder meets the Listing includes medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and either repeated episodes of decompensation, each of extended duration; or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate or a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C. F. R. Pt. 404, Subpt. P, App. 1, Section 4.04C 1, 2, 3 (Thomson Reuters/West 2008).

Applying Plaintiff's affective disorder records to Section 4.04C of the Listing, there is no correlation. Clearly there is a medically documented history of major depressive disorder treated and/or monitored by Nurse Bender. However, the major depressive disorder was in remission from November 5, 2002 to January 15, 2004. After treatment from January 15, 2004 to February 8, 2005, Nurse Bender considered Plaintiff's major depression resolved (Tr. 531, 542, 544). The medically documented history is not indicative that Plaintiff's affective disorder lasted for two years. Unable to satisfy this threshold requirement, Plaintiff failed to demonstrate that his impairment met Section 4.04C of the Listing.

### B.     The ALJ Should Have Employed a Medical Advisor.

Plaintiff claims that the ALJ erred by failing to employ a medical advisor to assist in clarity of his mental impairment on the Listing.  Again, the Magistrate does not hold that the ALJ was required to accept testimony from a medical advisor.  As previously stated, the language of the regulations suggests that the ALJ's use of medical advisors is permissive, not mandatory. 20 C. F. R. § 404.1527(f)(2) (Thomson Reuters/West 2008).  The ALJ may ask for and consider the opinions of medical advisors on the nature and severity of an impairment and whether it equals the requirements of any of the listed impairments. 20 C. F. R. § 404.1527(f)(2) (Thomson Reuters/West 2008).  The medical record was not particularly difficult to unravel and there is only a medical provider of mental health treatment.  Consequently, there was no conflicting evidence.  The ALJ's failure to call a medical advisor does not prevent the Magistrate from finding that substantial evidence supported his decision that Plaintiff's mental impairment was not equivalent to an impairment in the Listing.

## C        The ALJ should have obtained Vocational Expert (VE) Testimony.

In his Reply, Plaintiff argues that a VE should have testified at the hearing.  Plaintiff claims that the state agency medical consultant found that he had moderate limitations noted in fourteen of the twenty criteria listed in the residual functional capacity form.  VE testimony was required to show the erosion to his occupation base brought on by his psychological limitations.

The opinions of state agency medical consultants must be considered by the ALJ but the ALJ is not bound by state agency medical consultant findings.  20 C. F. R. § 404.1527(f) (2) (i) (Thomson Reuters/West 2008).  The ALJ did exactly what the rule required–he considered the testimony of all state agency physicians (Tr. 24).  He attributed little weight to their opinions for the reason that none of the state agency professionals treated or examined Plaintiff.  Thus, the ALJ was not compelled to give substantial weight to their opinions.  As he gave little weight to these opinions, it is unlikely that he

would have included them as limitations in a hypothetical question posed to the VE.  VE testimony was not required to corroborate testimony that the ALJ did not consider credible.  Plaintiff has presented no other cognizable reason for obtaining VE testimony.

**4.** **The ALJ Failed to Address Plaintiff's Limited Intellectual Capacity**.

Section 12.05, mental retardation, refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i. e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirement in B is satisfied.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.05 (Thomson Reuters/West 2008).  In B, the claimant must have a valid, verbal, performance, or full scale IQ of 59 or less.  20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.05 B (Thomson Reuters/West 2008).

Even if the Magistrate finds that the IQ score of 59 is valid (Tr. 345), the IQ score is secondary to the initial requirement that the onset of this impairment must initially manifest during the developmental period.  None of the examiners' reports suggest that Plaintiff's intellectual functioning was manifest during this time.  There is nothing on which the ALJ could rely that would warrant a finding that Plaintiff intellect was significantly subaverage to constitute mental retardation.

**5.** **The ALJ Failed to Assess the Combined Effect of Plaintiff's Impairments or Determine Medical Equivalence** .

Plaintiff complained that the ALJ failed to fully analyze whether in combination, his condition equaled in severity that was described in the Listing.  Plaintiff also suggests that the ALJ erred in failing to find that his impairments were medically equivalent to the Listing.

**A.** **The ALJ failed to Assess the Combined Effect of Plaintiff's Impairments**.

Even if it is found that Plaintiff does not precisely meet any of the Listing relative to his cardiac,

mental health and intellectual impairments, the ALJ must consider the combined effects of Plaintiff's impairments that individually may be non-severe but in combination may constitute a medically severe impairment.  Plaintiff claims that the ALJ failed to undertake such an analysis.

In the Sixth Circuit, the Court found on two occasions that the decision itself suggested that the ALJ did consider the combination of impairment as he or she was required to do.  *Gooch v. Secretary of Health and Human* Services, 833 F. 2d 589, 592 (6th Cir. 1987); *cert. denied sub nom. Gooch v. Bowen*, 108 S. Ct. 1050 (1988); *Loy v. Secretary of Health and Human Services*, 901 F. 2d 1306, 1310 (6th Cir. 1990).  Specifically, the analysis of combined impairments was sufficient where the ALJ referred to a "combination of impairments".  *Id.* at 592, *Id.* at 1310.  The ALJ referred to consideration of the entire record in his assessment of residual functional capacity and factored the combined impairments into the assessment of residual functional capacity.  *Id.* impairment, considering all of the claimant's impairments.  *Id.* The ALJ's individual discussion of the multiple impairments did not imply that the ALJ failed to consider the effect of the impairments in combination.  *Id.*

In this case, the ALJ specifically analyzed Plaintiff's impairments in combination, stating that "the claimant does not have a mental impairment that meets Listings 12.04. . . and the claimant does not have an impairment that meets Listing 4.02(B) . . ."  The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C. F. R.  Part 404, Subpart P, Appendix .  The ALJ considered each severe impairment in imposing the limitations on Plaintiff's residual functional capacity.  Although the ALJ did not engage in an elaborate articulation of his thought process in assessing the combined effect of Plaintiff's impairments, the Magistrate cannot find that the ALJ failed to consider the effect of Plaintiff's impairments in combination particularly since the ALJ specifically referred to the combination of

impairments in finding that Plaintiff did not meet the Listings.

**B.      The ALJ Failed to Determine Medical Equivalence.**

Plaintiff urged the ALJ to consider that even though his impairments did not meet the Listing in combination, they are at least at equal medical significance to those of a listed impairment.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity.  *Ridge v. Barnhart,* 232 F. Supp.2d 775, 787 (N. D. Ohio 2002) (*citing* 20 C.F.R. § 404.1525).  To meet a listed impairment, the claimant must show that his impairment meets all of the requirements for a listed impairment.  *Id*. at 787-788 (*citing Hale v. Secretary,* 816 F.2d 1078, 1083 (6th Cir. 1987); 20 C.F.R. § 404.1525(d)).  An impairment that meets only some of the medical criteria, and not all, does not qualify, despite its severity.  *Id*. (*citing Sullivan v. Zebley,* 110 S. Ct. 885, 891 (1990)).  If an impairment is not the same as a listed impairment then a determination must be made as to whether the impairment is medically equivalent to a listed impairment.  20 C. F. R. § 404.1529(d)(3) (Thomson Reuters/West 2008).

Cardiac artery disease, affective disorder and mental retardation manifest the specific findings described in the set of medical criteria for the particular listed impairment.  Thus, there was no need to consider whether symptoms, signs and laboratory findings are medically equal to the Listing.

**6.      The Fourth Prong of the Sequential Evaluation Remains in Dispute**.

Plaintiff claims that the ALJ correctly found that he was not able to perform any of his past relevant work.  The burden shifted to the Commissioner to establish that there was other work that he could perform.  Plaintiff maintains that since he can perform less than a full range of sedentary work, the four components of the Medical Vocational Guidelines (Grid) could not be applied as the four components of the Grid did not precisely coincide.  Thus, the Commissioner failed to carry his burden at step four of the sequential evaluation.

### A.      Plaintiff's Maximum Sustained Work Capability is Limited to Less than Sedentary Work.

Plaintiff claims that the ALJ characterized his physical exertion level as less than a full range of sedentary work.  The ALJ found that Plaintiff had the residual functional capacity to exert up to ten pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push or otherwise move objects. . . . the claimant can sit most of the day with brief periods of walking and/standing....

The physical exertion requirements for sedentary work involves lifting no more that 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  20 C. F. R. § 1567(a) (Thomson Reuters/West 2008).  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  20 C. F. R. § 404.1567(a) (Thomson Reuters/West 2008).  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C. F. R. § 404.1567(a) (Thomson Reuters/West 2008).

The Magistrate finds that the ALJ findings suggest that Plaintiff could substantially meet the exertional requirements for sedentary work as defined in the regulations.  Thus, the ALJ could use the

category of the Grid restricted to sedentary work.

### B.     The Appropriate Use of the Grid.

Plaintiff contends that the ALJ should not have utilized the Grid in determining that he was not disabled.  His depression qualifies as a non-exertional limitation, thereby precluding the application of the Grid.  However, Plaintiff misapprehends the significance of the non-exertional impairment.  It is *only* when "the non-exertional limitation restricts a claimant's performance of a full range of work at the appropriate residual functional capacity level that non-exertional limitations must be taken into account and a non-guideline determination made." *Kimbrough v. Secretary of Health and Human Services,* 801 F.2d 794, 796 (6th Cir. 1986) (*citing Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 528 (6th Cir. 1981)).  The non-exertional impairment must show an impairment that significantly limits his or her ability to do a full range of work at a designated level.  *Id.*

Although the ALJ did not specifically state that Plaintiff's non-exertional impairment was not severe enough to prevent him from performing a full range of sedentary work, there is the clear indication from his combined findings that Plaintiff's non-exertional limitation has little or no effect on the occupational base of unskilled sedentary work (Tr. 25).  In other words, the ALJ found that there was no significant impairment that would prevent Plaintiff from performing a full range of work.  Accordingly, the ALJ was not required to obtain a non-guideline determination.  Use of the Grid was appropriate under these circumstances.

### 7.     The ALJ Misinterpreted Dr. Adusumilli's Opinions.

Dr. Adusumilli opined on December 22, 2005, that Plaintiff's ejective fraction was only 35%.

Thus, Plaintiff's condition was deteriorating.  He suggested that the Commissioner give serious consideration to awarding Plaintiff benefits.  Even if substantial deference is given to Dr. Adusumilli's opinion, an ejection fraction of 30 percent or less is required to show chronic heart failure of the required level of severity for an impairment under the Listing.  20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters/West 2008).

Plaintiff contends that the ALJ erred in failing to consider Dr. Adusumilli's suggestion that he is entitled to benefits because of his impairment.  The Magistrate finds that this determination was reserved for the Commissioner.

Medical sources, particularly treating sources, are used to provide evidence, including opinions, on the nature and severity of the claimant's impairments.  20 C. F. R. § 404.1527(e)(2) (Thomson Reuters/West 2008).  Although medical source opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, the claimant's residual functional capacity or the application of vocational factors, the final responsibility for deciding these issues is reserved for the Commissioner.  20 C. F. R. § 404.1527 (e)(2) (Thomson Reuters/West 2008).  No special significance will be given to the source of an opinion on issues reserved for the Commissioner.

The Magistrate cannot find that the ALJ erred in failing to attribute significance to Dr. Adusumilli's opinions that Plaintiff was disabled or that he should be awarded benefits.

## 8.      The Court Should Reevaluate Dr. Adusumilli's Opinions.

Dr. Adusumilli provides support for Plaintiff's application for Social Security disability based

on his "underling severe coronary artery disease and LV systolic dysfunction" (Tr. 558). Plaintiff urges the Court to review Dr. Adusumilli's opinion and the questions posed to him in determining how his opinion is to be interpreted. Plaintiff suggests that if the Court attributes significant weight to Dr. Adusumilli's opinions, the Court would have determined that Plaintiff cannot work due to cardiac impairments.

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. *Ridge v. Barnhart,* 232 F. Supp.2d 775, 786 (N. D. Ohio 2002). This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* (*citing* 42 U.S.C. § 405(g)). Therefore, this Court is limited in determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990)). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Id.* (*citing Walters, supra*, 127 F.3d at 528).

It is well established that the Magistrate cannot weigh Dr. Adusumilli's opinions and order a new result. Plaintiff's request to reassess the evidence must be denied.

## **CONCLUSION**

For the foregoing reasons, the Magistrate recommends that the Commissioner's decision be affirmed and the referral to the Magistrate terminated.

/s/Vernelis K. Armstrong
United States Magistrate Judge

32

Dated: 12/30/08

## <u>NOTICE</u>

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation. A party desiring to respond to an objection must do so within ten (10) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.