IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

William R. Booth, Jr.,

Plaintiff

v.

Commissioner of Social Security,

Defendant

Case No. 3:08CV332

ORDER

In this appeal, I review defendant Commissioner of Social Security's [Commissioner] final decision denying plaintiff William R. Booth's claims for disability, disability insurance benefits [DIB] and supplemental security income [SSI] under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). Jurisdiction is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 405(g)

Booth objects to the Magistrate Judge's Report and Recommendation [Magistrate's Report] [Doc. 25] and requests that I reverse the Commissioner's decision. [Doc. 26]. Based on de novo review of the record, I overrule Booth's objections.

## Procedural Background

Booth filed applications for DIB and SSI on July 30, 2001, which the Social Security Administration [Administration] denied both initially and on reconsideration. Administrative Law

Judge [ALJ] Richard VerWiebe conducted an administrative hearing on June 9, 2005, and denied Booth's applications on February 23, 2006. On December 20, 2007, the Social Security Administration's Office of Hearing and Appeals denied Booth's request for review, thereby rendering the ALJ's decision the final judgment of the Commissioner.

Plaintiff then sought judicial review of the Commissioner's decision, leading to Magistrate Judge Vernelis K. Armstrong's December 30, 2008 Report and Recommendation affirming the Commissioner's decision.

Notably, on March 3, 2006, Booth filed a new application for benefits. The ALJ found Booth eligible for disability, DIB and SSI as of February 24, 2006. My review, therefore, focuses exclusively on the time period between March 22, 2001 and February 23, 2006.

**Medical History**

Because the Magistrate's Report laid out Booth's medical history in detail, which includes opinions from approximately 20 physicians, I only describe the most relevant information here.

Plaintiff is 5'9" and weights 243 pounds. At his last place of employment, Booth worked as a supervisor in a propane plant. Before that, he managed a restaurant, worked as a janitor and delivered pizzas. During his role as a propane plant supervisor, Plaintiff had his first heart attack and did not return to work because he could not handle the stress. Since then, he has had four more heart attacks, coronary bypass surgery and three stents implanted. Booth also has coronary artery disease, chronic obstructive pulmonary disease [COPD], asthma, bronchitis and hypertension. Booth's global ejection fraction remains within the normal range of 54 percent, with his left ventricular ejection fraction ranging from 61% to 35%.

Booth has sleep apnea, which he originally treated with a continuous positive airway pressure [CPAP] mask, and then later with a bi-level positive airway pressure apparatus [BiPap] machine.

Booth also suffers from many mental ailments. He has been diagnosed with depressive disorder, intermittent explosive disorder, cannabis abuse, borderline intellectual functioning, bi-polar II disorder, organic affective syndrome and post-traumatic stress disorder.

Clinical psychologist Richard N. Davis, Ph.D. and licensed psychologist Alan White, Ph.D., administered various tests on Booth, including the Wechsler Adult Intelligence Scale III [WAIS-III]. Despite his low IQ scores [performance scores of 68 and 60], both administrators opined that Booth's actual IQ was higher, either because Booth malingered while taking the examination or by comparing Booth's score to his overall performance throughout his life.

Dr. Eli Perencevich conducted a residual functional capacity [RFC] assessment, in which he concluded that Booth should avoid concentrated exposure to extreme cold, extreme heat, fumes and odors but could stand and/or walk six hours in an eight-hour workday. Likewise, Dr. Kim Togliatti-Trickett opined that Booth should not have difficulty with work-related activities for at least four to six hours with breaks.

**Standard for Disability**

To determine disability, the ALJ engages in a sequential, five-step evaluative process. 20 C.F.R. § 404.1520 (1999). The ALJ considers whether: 1) claimant is engaged in work that constitutes substantial gainful activity; 2) claimant is severely impaired; 3) claimant's impairment meets or equals the Secretary's Listing of Impairments [Listings]; 4) claimant can perform past relevant work; and 5) other jobs exist in significant numbers to accommodate claimant if claimant

cannot perform his past relevant work, given his RFC, age, education and past work experience. *Id*. The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five.

**ALJ Findings**

The ALJ found that Booth [R. at 19-25]:

1) met the insured status requirements of the Act through December 31, 2006;
2) had not engaged in substantial gainful activity at any time relevant to this decision;
3) had severe impairments of coronary artery disease, obesity and depression;
4) did not have an impairment or combination of impairments that met or medically equaled one listed in 20 C.F.R §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.926;
5) retained the RFC capacity to exert up to ten pounds of force occasionally, and/or a negligible amount of force frequently to lift, carry, push or otherwise move objects, including the human body. Booth could sit most of the day with brief periods of walking/standing and was restricted to performing simple tasks;
6) was unable to perform his past relevant work;
7) was a "younger individual," had a limited education and ability to communicate in English. Thus, with his RFC, he could perform work that existed in the national economy;
8) was of a young age, rendering transferability of job skills immaterial to the determination of disability;
9) was not under a "disability" as defined by the Act, at any time from March 2, 2001 through February 23, 2006.

**Standard of Review**

When reviewing the Magistrate's report, I make a de novo determination of the portions to which Booth objects. *See* 28 U.S.C. § 636(b)(1).

In reviewing the Commissioner's decision, I must determine whether substantial evidence supports the ALJ's findings, and whether the ALJ applied the proper legal standards. 42 U.S.C. § 405(g); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). I "may not try the case de novo, nor resolve

conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir.1994). If substantial evidence supports it, I must affirm the ALJ's decision, even if I would have decided the matter differently. 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brainard*, *supra*, 889 F.2d at 681 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence in support of the ALJ's findings exists, I view the record as a whole, *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980), and consider anything in the record suggesting otherwise. *See Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir.1978).

## Discussion

Booth objects to the Magistrate's findings that: 1) his lumbar disc disease, sleep apnea, pulmonary impairments and limited intellectual capacity do not constitute severe impairments; 2) his conditions, individually and in combination, do not equal those described in the Listings; 3) the ALJ properly applied the medical vocational guidelines [grids]; and 4) the ALJ treated Dr. Adusumilli's opinion appropriately.

### 1. Lumbar Disc Disease, Sleep Apnea, Pulmonary Impairments and Limited Intellectual Capacity Do Not Constitute Severe Impairments

An impairment or combination of impairments is severe if it significantly limits an individual's ability to perform basic work activities. A non-severe impairment is an impairment or combination of impairments that does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521. If claimant lacks a severe impairment or

combination thereof, he is not disabled; if claimant has a severe impairment or combination thereof, then the analysis proceeds to the next step.

After reviewing the record, I find that substantial evidence supports the ALJ's conclusion that Booth's sleep apnea, pulmonary impairments and limited intellectual capacity constitute non-severe impairments, and thus, Booth is not disabled due to these ailments. [1]

**A. Sleep Apnea**

Substantial evidence supports the ALJ's conclusion that Booth's sleep apnea is not a severe impairment because Booth uses a BiPap machine, adequately mitigating the effects of his impairment. *See Csanyi v. Barnhard,* 2002 WL 31685728, * 6 (N.D.Ohio) (finding plaintiff not disabled because "his only recognized severe impairment, and dizziness were both controlled with medication"); *Warford v. Bowen,* 875 F.2d 671, 673 (8th Cir.1989) ("A medical condition that can be controlled by treatment is not disabling.").

Booth contends that evidence does not support the ALJ's conclusion, and points to a letter from Dr. Dean M. Bernardo cautioning Booth not operate a motor vehicle when he is "excessively sleepy." [R. at 456]. As most physicians would caution their patients from driving a car when they are "excessively sleepy," I do not find that this restriction, alone, illustrates the severeness of Booth's condition. Moreover, the same letter from Dr. Bernardo indicates that Booth's "apnea / hypopnea index is normal" and "he has no problems with sleeping at this time." [*Id*.]. Therefore, Booth's arguments are not well-taken.

---

[1] Despite his initial argument to the contrary, Booth no longer "dispute[s] the issue of whether [his lumbar disc disease] is severe." [Doc. 26]. As such, I have no reason to evaluate this claim.

**B. Pulmonary Impairments**

Booth, additionally, asserts that his pulmonary impairments constitute severe limitations. For the following reasons, I find that substantial evidence supports the ALJ's finding that Booth's pulmonary impairments are not substantial.

Booth accurately points out that Dr. Kim Togliatti-Trickett, the Commissioner's chosen physician, examined Booth and diagnosed him with three pulmonary related ailments–COPD, asthma and bronchitis. As noted by the Magistrate, however, substantial evidence indicates that Booth can remedy these ailments through medication. *See Csanyi, supra,* 2002 WL 31685728, at * 6. Booth treated his chronic bouts of bronchitis with antibiotics and improved his COPD with a bronchodilator. Moreover, despite Dr. Togliatti-Trickett's diagnoses, she opined that Booth should not have difficulty with work-related activities for at least four to six hours with breaks.

Booth further contends that the Administration's physician Dr. Perencevich found that Booth needs to avoid concentrated exposure to extreme heat, extreme cold, fumes, odors, dusts, gases, poor ventilation and other respiratory irritants. Booth asserts that the need to avoid atmospheric pollutants is a vocationally relevant limitation that should have resulted in a finding of a severe impairment, rendering his pulmonary impairments severe.

However, the ALJ considered Dr. Perencevich's opinion but decided not to assign it significant weight. The ALJ stated: "The State Agency physicians neither treated nor examined the claimant . . . [m]ore weight is given to the opinion of his treating sources." [R. at 24]. Because the ALJ provided sufficient reason to assign less weight to the opinion of the non-treating, non-examining physician, I cannot re-weigh the evidence. *See Tenn. Consol. Coal Co. v. Kirk,* 264 F.3d

602, 606 (6th Cir.2001) ( "We do not reweigh the evidence or substitute our judgment for that of the ALJ."). Thus, I affirm the Magistrate's conclusion.

**C. Limited Intellectual Capacity**

Booth contends that his limited intellectual capacity constitutes a severe impairment. Substantial evidence supports the ALJ's decision finding otherwise and therefore, I reject Booth's claim.

Although an IQ score of less than 80 constitutes a severe impairment, *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 693 (6th Cir. 1985), courts can reject scores even lower than 80 if the examiner finds that the claimant's score did not reflect his real status because claimant did not put forth a good effort on the tests. *Williamson v. Sec'y of Health & Human Servs.*, 796 F.2d 146, 149-50 (6th Cir. 1986).

Here, two examiners tested Booth's IQ and found his scores to range from 59 to 68; however, both examiners discredited these results. Dr. White stated that Booth lacked perseverance throughout the testing process, and Mr. Davis opined that Booth's overall performance throughout his life suggested that he was capable of at least lower borderline functioning and probably higher. As such, these scores do not render the ALJ's determination erroneous.

Booth also points to Dr. White's conclusion that "a payee would be advised to manage any assigned funds due to his limited level of cognitive functioning" to support his claim. [R. at 347]. However, Dr. White's opinion makes clear than Booth's most severe limitations stem from his depression, not his limited intellectual functioning.

Booth also highlights Mr. Davis' statement that Booth "was able to pronounce words at the 5.0 grade level" and "is very simplistic in his thinking." [R. at 173]. However, Mr. Davis also

concluded that Booth was capable for at least lower borderline functioning and probably higher, providing substantial evidence to support the ALJ's conclusion.

**2. Booth's Impairments Do Not Meet The Listings**

If claimant's impairment is equal to one in the Listings and meets its durational requirement, the Secretary "will find [the claimant] disabled without considering [his] age, education, and work experience." 20 C.F.R. § 404.1520. Although the ALJ is "responsible for deciding the ultimate legal question of whether the listing is met or equalled," he may obtain opinions from a medical advisor. Social Security Ruling 83-19. *Curry v. Sec'y of Health & Human Servs.*, 856 F.2d 193, *5 (6th Cir. 1988) (unpublished disposition).

Booth contends that the ALJ erred in failing to retain a medical advisor and in determining that his conditions, individually and in combination, did not meet the Listings.

**A. Medical Advisor**

Booth argues that due to the difficulty in determining the medical equivalence of a large combination of ailments, the ALJ should have employed a medical advisor. Booth points to the ALJ's need to interpret complicated cardiac tests, psychiatric issues, pulmonary problems, sleep apnea, low IQ and the likely side effects of nearly 20 different medications.

I disagree. The ALJ's use of a medical advisor is permissive, not required. 20 C.F.R. § 404.1527(f)(2). *See Coleman v. Chater*, 1996 WL 279868, * 4 (6th Cir.) (unpublished disposition). Moreover, given the vast number of medical opinions provided to the ALJ, the ALJ's decision not to seek such an expert is not in err.

**B. Collective Impairments**

Booth also asserts that because he has multiple impairments that nearly meet the Listings individually, his impairments must meet the Listings collectively. *See Lowry v. Astrue*, 2008 WL 4372658, * 5 (S.D.Ohio 2008) ("The Regulations, moreover, require the agency to consider the combined effect of all of the claimant's ailments, regardless of whether any such impairment, if considered separately, would be of sufficient severity.") (internal citations omitted). Specifically, he points to his left ventricular ejection fraction of 35 percent, his severe depression which resulted in "marginal adjustment" as demonstrated by his unusual living arrangements and his low IQ scores.

Because substantial evidence supports the ALJ's conclusion, I disagree with Booth's contention.

First, it is clear that the ALJ considered the collective impact of Booth's impairments, as he stated "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . ." [R. at 20]. In the Sixth Circuit, this statement suffices to show that the ALJ considered the effect of the combination of impairments. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir.1987) (finding that the ALJ considered claimant's ailments in combination because he noted that "a combination of impairments" did not meet the Listings, and discussed his "impairments"); *Loy v. Sec'y of Health & Human Servs*., 901 F.2d 1306, 1310 (6th Cir.1990).

As explained in *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986), "even in a close case in which the myriad medical problems of the claimant are [] evident," a court can only disturb the ALJ's factual findings if they are "legally insufficient." As in *Dorton*, Booth's medical evidence almost establishes disability; nonetheless, "even when h[is] additional ailments are added to the

equation, [I] find that []he has not presented adequate medical evidence of disability to demonstrate that h[is] combined impairments are equivalent to any listed impairment." *Id.*

Booth's depression, low ventricular ejection fraction and IQ scores simply are not severe enough, individually or in combination, to equal a Listing.

**3. The ALJ Properly Relied On The Grids During Step Five**

If claimant proves unable to perform any past relevant work, the Secretary has the burden of proving that claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R § 404.1520(a)(4)(v).

Grids are utilized by the Secretary during the final step of the disability decision to determine whether plaintiff can perform other jobs in the national economy. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The grids allows the Secretary to take "administrative notice" that plaintiff has met the requirements to perform certain jobs in the economy. *Id.*

If claimant only has non-exertional impairments, the ALJ may only use the grids as a framework. *Id*. If the claimant only has exertional impairments, the ALJ may rely on the grids so long as the claimant's characteristics do not materially differ from those noted in the grids. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981). If the claimant's characteristics do not coincide with the grids, the Secretary must produce expert vocational testimony or other similar evidence to establish that jobs are available in the national economy for a person with the claimant's characteristics. *Abbott, supra*, 905 F.2d at 927; *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir. 1984).

If claimant has both exertional and non-exertional impairments, the ALJ may rely on the grids only if "the nonexertional impairment does not significantly diminish [claimant's] ability to

perform a full range of work at the designated level." *Pierce v. Sec'y of Health and Human Servs.*, 1987 WL 37386, * 7 (6th Cir.) (unpublished disposition). To significantly diminish the ability to work, the claimant's impairment must produce an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* (quoting *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

Thus, if a claimant's nonexertional impairments significantly diminish his ability to work at the designated level, the ALJ cannot rely on the grids to show that a significant number of jobs exist in the national economy that a claimant can perform. 20 C.F.R. § 404.1567; *Burton v. Sec'y of Health & Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990).

Plaintiff argues the ALJ erred in applying the grids and failing to employ a vocational expert because: 1) his low intellectual functioning and depression significantly limit the range of simple tasks he can perform; and 2) exertional limitations do not fully coincide with the grids.

**A. Nonexertional Limitations**

After reviewing the entire record, I find that Booth's nonexertional impairments do not significantly diminish his ability to work as an unskilled, sedentary employee. According to Social Security Rule 96-9p, the mental demands generally required for unskilled work includes "the abilities, on a sustained basis, to: understand, remember and carry out simple instructions; make simple work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." *Sparks v. Astrue*, 2008 WL 4279999, * 7 (E.D.Ky.).

Booth argues that his impairments substantially diminish his ability to work by pointing to Dr. Wagner's evaluation. Dr. Wagner evaluated 20 skill sets set forth and found Booth to suffer "moderate limitations" in 14 of the areas. Among others, Dr. Wagner found Booth moderately limited in the ability to make simple work-related decisions, maintain attention and concentration for extended periods, interact appropriately with the general public and respond appropriately to changes in the work setting.

However, Dr. White's opinion provides substantial evidence that Plaintiff's depression and intellectual capabilities do not severely limit his ability to perform a full range of work at an unskilled level. Dr. White found Booth to fall in the "not impaired" or "mildly impaired" categories in most cases, and only moderately impaired in his ability to withstand stress and pressures associated with day-to-day work and respond appropriately to changes in a routine work setting. *See Rutter v. Comm'r of Social Sec*., 1996 WL 397424, * 2 (6th Cir.) (unpublished disposition) (upholding ALJ's finding that claimant was not disabled, explaining his mental RFC where claimant was not found to be "markedly limited" in any area, "moderately limited" in a few areas, and either "not significantly limited" or "no evidence of limitation in this category" in the remaining).

As with the classic question of whether a glass of water is half full or half empty, there is substantial evidence to support either a finding that Booth is significantly limited or is not significantly limited. The ALJ chose the latter finding. Because substantial evidence supports the ALJ's decision, I may not overturn it. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) ("The substantial-evidence standard allows considerable latitude to administrative decisionmakers. It presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision." (internal citations omitted).

Moreover, the fact that the ALJ found Booth to have severe depression in Step Two of the analysis does necessitate a finding of a substantial limitation in Step Five. *See Lane v. Astrue*, 2008 WL 53706, * 7 (E.D.Tenn.).

**B. Exertional Limitations**

Booth first contends that his severe pulmonary impairments render the grids not "fully applicable." 20 C.F.R. § 404, Appx. 2 to Subpt. P at § 200.00(e) (noting that severe pulmonary precautions preclude reliance on the grids). I already concluded that substantial evidence supports the ALJ's finding that Booth's pulmonary limitations are not severe; thus, the ALJ did not err by applying the grids.

Next, Booth argues that the ALJ significantly decreased the exertional requirements of a sedentary job when finding that he can perform sedentary work due to his ability to lift 10 pounds of force occassionally. The regulation requires the capacity to lift "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). According to Booth, he can exert up to ten pounds occasionally, and because occasionally means "occurring from very little up to one-third of an 8 hour work day," [R. at 221], the ALJ found him able to do only one-third as much as sedentary work demands.

I find this argument unavailing. The ALJ's decision that Plaintiff could substantially meet the exertional requirements for sedentary work as defined by the regulations is supported by substantial evidence. Dr. Togliatti-Trickett opined that Booth should not have difficulty with work-related activities such as standing and walking for at least four to six hours at a time with breaks.

Although repetitive lifting might be a problem, the ALJ's conclusion that Booth could lift 10 pounds of force occasionally falls short of repetitive lifting. Therefore, the ALJ lawfully relied on the grids.

**4. ALJ Appropriately Interpreted Dr. Adusumilli's Opinion**

Booth argues that the ALJ did not properly defer to two opinions of Dr. Adusumilli, a treating physician. I disagree.

First, Dr. Booth challenges the ALJ's decision not to defer to Dr. Adusumilli's opinion that: "I would suggest serious consideration of providing social security disability benefits to William Booth, Jr. with underlying severe coronary artery disease and LV systolic dysfunction." [R. at 558].

Although an ALJ should defer to a treating physician's opinion supported by medical evidence, the ALJ need not defer with regard to the ultimate legal issue. 20 C.F.R. § 404.1527. Because "the [ultimate] determination of disability is the prerogative of the [Commissioner], not the treating physician," I need not accept Dr. Adusumilli's opinion on this issue. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984); *West v. Comn'r Social Sec. Admin.*, 240 Fed.Appx. 692, 696, 2007 WL 1991059, * 3 (6th Cir.) (unpublished disposition); *see Richards v. Comm'r of Social Sec.*, 2008 WL 3840929, * 7 (E.D. Mich.) ("Although it is proper for the ALJ to give a treating physician's opinion controlling weight, the Social Security Administration Regulations do not afford the same deference to opinions on an issue reserved to the Commissioner, such as a final determination of 'disabled' or 'unable to work.'").

Booth also objects to the ALJ's treatment of Dr. Adusumilli's opinion that Booth's left ventricular ejection fraction was 35 percent and "might worsen in the future." [R. at 558]. The ALJ "does not give much weight" to the doctor's opinion because the record's overall medical evidence

finds Booth's left ventricular ejection fraction to be at least 50 percent, on average, and does not indicate that Booth's condition has lasted, or will last, for twelve months. [*Id*.].

The ALJ did not err, as he may devalue the opinion of a treating physician "when there is substantial medical evidence to the contrary." *Cutlip, supra*, 25 F.3d at 287.

Even if the ALJ completely deferred to Dr. Adusumilli's opinion, however, Booth's impairment still falls short of satisfying the Listings, which require ventricular ejection fraction to be 30 percent or below. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 402A1. Here, Dr. Adusumilli found Booth's ventricular ejection fraction to be 35 percent, and stated that it "might worsen," showing a level of uncertainty.

Booth also tries to belie the ALJ's statement that there is no evidence that Booth's condition has lasted, or will last, for twelve months. Again, even complete deference to Dr. Adusumilli does not rebut this assertion. Although Booth's condition began over twelve months ago in 1995, there is no evidence that his left ventricular ejection fraction will deteriorate to 30 percent, and then remain at that level for at least twelve months. Based on the foregoing, I affirm the Magistrate's opinion.

**Conclusion**

For the foregoing reasons, it is hereby:

ORDERED THAT Plaintiff's objections to the Report and Recommendation of the United States Magistrate Judge be, and the same hereby are, overruled.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge